John W. Howard (SBN 80200)
Scott J. Street (SBN 258962)
Peter C. Shelling (SBN 351159)
**JW HOWARD | ATTORNEYS, LTD**
600 West Broadway, Suite 1400
San Diego, CA 92101
Tel: (619) 234-2842

James Rogers* (AZ Bar No. 027287)
Rachael Griffin* (VA Bar No. 98207)
Laura Stell* (NC Bar No. 59840)
Brittany Bennett* (GA Bar No. 717377)
**AMERICA FIRST LEGAL FOUNDATION**
611 Pennsylvania Ave, SE #231
Washington, DC 20003
Telephone: (202) 964-3721

*Admitted *pro hac vice*

Attorneys for Plaintiff John Loeffler

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOHN LOEFFLER,<br><br>Plaintiff,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION, a New York Corporation; and ARVIND KRISHNA, an individual,<br><br>Defendants. | Case No.: 2:25-cv-05765-CBM-PD<br><br>[Assigned to the Honorable Consuela B. Marshall]<br><br>**AMENDED DECLARATION OF SCOTT J. STREET IN SUPPORT OF MOTION TO MODIFY SCHEDULING ORDER [PUBLIC REDACTED COPY]**<br><br>[Filed concurrently with Motion to Modify Scheduling Order; [Proposed] Order lodged concurrently]<br>Date: November 3, 2026<br>Time: 10:00 a.m.<br>Crtrm: 8D |

## AMENDED DECLARATION OF SCOTT J. STREET

I, Scott J. Street, declare as follows:

1. I am an attorney duly licensed to practice law before all courts in the state of California and before this Court. I am a partner with JW Howard Attorneys, counsel of record to Plaintiff John Loeffler in this action. I have personal knowledge of the facts set forth in this declaration and could testify competently to them if called to do so. I submit this declaration in support of Mr. Loeffler's motion to modify the scheduling order to extend the discovery cutoff through the end of 2026. The additional time is needed to complete remaining depositions and obtain the evidence required to oppose IBM's anticipated summary judgment motion and to prepare this case for trial by mid-2027. I have personal knowledge of the background litigation facts set forth below based on my review of documents in this matter and my participation in depositions. Those facts are provided for background to frame the relevant discovery issues.

2. Mr. Loeffler used to work for IBM. He sold IBM's Cloud Platform. He worked successfully for IBM for many years.

3. Mr. Loeffler's job specifically focused on selling IBM's Cloud Platform to clients in the government, education, and health care settings, a market that IBM calls "PubFed" (short for "Public and Federal Markets"). He was one of dozens of employees across the country who worked in that division.

4. By the end of 2022, Mr. Loeffler had established himself as a critical member of the PubFed team. He was so valuable, in fact, that IBM gave him a special job: working as a specialist across the PubFed team.

5. In that role, Mr. Loeffler did not have a dedicated sales territory. Instead, he worked across the country and was supposed to be credited with sales revenue that reflected his cross-territory work. That included credit for Project Comet, a major PubFed sales project that Mr. Loeffler worked on between 2020 and 2023.

6. Mr. Loeffler's compensation plan reflected that value. For example, at the



JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

end of 2022, IBM gave him an Incentive Plan Letter ("IPL") that entitled him to credit both for his own sales results and the results achieved by his team, a quota plan typically reserved for executives, such as Mr. Loeffler's then-boss, Tom Scott.

7. By early 2023, Mr. Loeffler had reached Band 10, the highest band of non-executive employees at IBM. Although he was then over 60 years of age, he had no intention of retiring anytime soon. As a single father, he regarded this period as a critical stage of his career: he planned to continue working for another decade in order to maximize his earnings, finish putting his kids through college, and position himself for retirement.

8. That plan was upended by IBM's aggressive embrace of diversity, equity and inclusion ("DEI") policies in 2023. The DEI push came at the worst possible time, coinciding with IBM's effort to downsize its sales force and reduce overall headcount, with a particular emphasis on eliminating Band 10 employees—the most senior, and typically, oldest employees. That effort was overseen by a group called the Technology Leadership Team ("TLT") and had a specific goal of increasing the number of diverse hires, especially in Band 10. A true and correct copy of an email and PowerPoint presentation regarding the TLT (labeled "confidential") is attached as **Exhibit "A."**

9. In other words, between 2022 and 2024, IBM had a corporate policy of pushing older white men out of its sales force to make room for younger employees, women, and people of color. And in the fall of 2023, IBM suddenly placed Mr. Loeffler and two other older white men on the PubFed team on Performance Improvement Plans ("PIPs") that, according to Mr. Loeffler, were nearly impossible to satisfy. When they failed to satisfy their PIP terms, IBM fired them.

10. Mr. Loeffler pushed back. He questioned the PIP's assumptions, arguing that IBM had not properly credited him with revenue as set forth in his IPL and that other terms of the PIP were unfair. A true and correct copy of his correspondence to IBM Sales VP Mike Ryan about that is attached as **Exhibit "B."**



JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

11. IBM did nothing to address those concerns. Based on the discovery to date, IBM did not even investigate whether Mr. Loeffler should have been credited with additional revenue, as he claimed, which would have gotten him off the PIP. Instead, Mr. Ryan told Mr. Loeffler that he spoke with IBM Legal and Human Resources employees and, according to Mr. Loeffler, that they would not make an exception for an older white man. A true and correct copy of Mr. Loeffler's notes about that conversation is attached as **Exhibit "C."**

12. At his deposition, Mr. Ryan denied making that comment. But he also testified that he did not recall the details of the conversation. And he admitted that several other comments that Mr. Loeffler attributed to him sounded like something he would say.

13. On November 1, 2023, IBM fired Mr. Loeffler. After exhausting his administrative remedies, Mr. Loeffler filed this case on June 25, 2025.

14. IBM answered the Complaint on September 17, 2025. The Court issued its first Scheduling Order on December 30, 2025, which set a fact-discovery deadline of July 31, 2026.

15. Discovery began during the spring of 2026 but proceeded slowly. IBM did not produce any documents until March 24, 2026, and that initial production comprised only 508 pages. To date, IBM has produced nearly 10,000 pages of documents, the vast majority of which were received after May 26, 2026. Productions are still ongoing. And IBM did not produce its first witness for a deposition (Mr. Ryan) until July 30, 2026.

16. Meanwhile, IBM refused to produce many key documents, including those related to the federal government's investigation into IBM's DEI policies. IBM paid $17 million to settle that case. A true and correct copy of the press release announcing that settlement, and the related settlement agreement, is attached as **Exhibit "D."**

17. By July 30, 2026, the parties were still deep in discovery, with numerous IBM depositions remaining and discovery disputes to resolve. Meanwhile, the revised

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

discovery cutoff was September 14, 2026. To allow time to litigate those disputes and complete the depositions, the parties agreed to a one-month continuance of the cutoff to October 14, 2026.

18. That extension still left little time. Therefore, at a deposition in New York on July 30, 2026, I asked IBM's counsel to check their witnesses' schedules so that the remaining depositions could be completed by the end of September. That schedule would have allowed the parties to finish the depositions, address issues arising from them, and complete litigation of any remaining discovery disputes.

19. Initially, IBM's counsel cooperated. They offered dates for a few key witnesses in early September 2026 and agreed to produce a witness to testify on IBM's behalf at a Rule 30(b)(6) deposition in New York on September 29, 2026.

20. In the meantime, we submitted to the Magistrate Judge our dispute over documents relating to the government investigation that IBM was withholding. The Magistrate Judge ruled in our favor. IBM then produced some of the requested documents.

21. Cooperation then stopped. For example, despite the Magistrate Judge's ruling that slides from a PowerPoint presentation related to the government investigation were relevant and should be produced, and despite IBM's written confirmation of that ruling and its initial statement of intent to produce those materials, IBM now refuses to produce the presentation.

22. Additionally, IBM witnesses were suddenly unavailable until late September. IBM also stated that it would not produce anyone for the Rule 30(b)(6) deposition in New York on September 29, 2026, and that it would not produce a Rule 30(b)(6) witness until October 13, 2026, the day before the discovery cutoff.

23. IBM further stated that it would not designate anyone to testify on its behalf regarding eighteen of the twenty-two topics on which we had requested testimony.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

24. It also appears that IBM has not been forthright about documents we have requested in discovery. For example, IBM claimed it did not have any documents detailing how it tracked diversity metrics between 2022 and 2024, the key period in this case and in the federal government's investigation. But just two weeks ago, we received a document showing that IBM was doing exactly that. The document reflects that IBM was tracking diversity metrics in the Sales division in which Mr. Loeffler worked and in Band 10, his assigned band. A true and correct copy of that document is attached as **Exhibit "E."**

25. Unfortunately, the data in Exhibit E was redacted. We therefore cannot make meaningful use it in the upcoming depositions unless IBM produces an unredacted copy. We will likely have to seek relief from the Magistrate Judge to obtain it.

26. That process will take time. Based on the pace of discovery to date, I do not believe we can complete discovery by October 14, 2026. I also begin a jury trial in San Diego on November 6, 2026. Thus, as a practical matter, I will not be able to complete any follow-up depositions until after Thanksgiving. As the lead trial lawyer on this case, my participation is critical in finishing the depositions. Extending the discovery cutoff through the end of 2026 will give us the time we need to gather the evidence required to take this case through the final stages of litigation.

27. We learned the information on which this motion is based after September 18, 2026. I promptly contacted IBM's counsel, explained why we need testimony from IBM on all of the requested topics, and advised them that the current deposition schedule, with depositions compressed into the last two weeks of discovery, does not allow sufficient time to complete the depositions and use the information obtained from them. That time is especially important in a complex discrimination case, involving a complex business, that will be proved through circumstantial evidence, including evidence that IBM's stated reason for terminating Mr. Loeffler was pretextual.

JW HOWARD/ ATTORNEYS, LTD.
600 West Broadway, Suite 1400
San Diego, California 92101

28. Given the time pressure, I asked IBM's counsel to meet and confer about extending the discovery cutoff through the end of 2026. That extension would allow us to complete the next wave of depositions by October 14, 2026, and provide time to conduct any follow-up discovery based on information we learn during those depositions. It would also allow us to obtain testimony from IBM on all key issues, including Mr. Loeffler's claim that IBM did not properly credit him with revenue for Project Comet. That evidence is critical both to Mr. Loeffler's discrimination claims, as circumstantial evidence of discrimination, and to his wage claims.

29. To date, we have not received any explanation about how that revenue was credited. The two IBM executives deposed so far did not know many of the key underlying facts, including why Mr. Loeffler was not credited with revenue consistent with his IPL and why no one questioned his PIP during the fall of 2023, even after he challenged the PIP's terms and assumptions.

30. Indeed, none of the IBM witnesses deposed to date has been able to explain how IPLs are created or evaluated. Given the importance of the IPL in this analysis, that testimony is critical. But it is still missing. IBM refuses to produce a witness to testify on its behalf about that topic. That is just one of eighteen topics that IBM has refused to produce a witness for.

31. That refusal is part of a larger problem. Mr. Loeffler worked in a technical and complex business. One witness, Mr. Ryan, testified that decisions were made by the "robots." And the events occurred several years ago. As this case moves toward trial, it is critical to obtain IBM's testimony on these issues. Relying on third-party "personal knowledge" depositions has not yielded, and likely will not yield, the information that Mr. Loeffler needs to oppose IBM's summary judgment motion. It will not give the Court a sufficient record to analyze these complex issues.

32. Most recently, during the September 29, 2026 deposition of Tracey Armstrong, we became aware of even more deficiencies in IBM's production. Ezequiel



JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

Piccione and Cameron Art were identified as the two IBM executives with final authority over approvals for PIP exceptions and extensions. *See* Armstrong Dep., p. 106, attached as **Exhibit "F**." There have been zero documents produced by IBM mentioning Mr. Piccione. In addition, no substantive communications from Mr. Art have been produced by IBM. Discussions regarding Mr. Loeffler's PIP exception and why some sellers were afforded extensions to their PIP deadlines while Mr. Loeffler was not, are key factual questions that currently remain unanswered due to IBM's failure to provide documents we believe to be responsive

33. In addition to Mr. Piccione and Mr. Art, Ms. Armstrong's testimony identified Nickle LaMoreaux and Sam Ladah as two high-level executives who would have had visibility to the Cognos Analytics dashboard contained in the disputed DOJ documents mentioned above. *See* Exh. F, p. 68.; *see also* IBM-LOEFFLER 0008033, attached as "**Exhibit G**." IBM has produced minimal documentation from either of these individuals. These excerpts from the Cognos Analytics dashboard demonstrate clear racial and sex-based targeting at the Band 10 level, despite IBM counsel's preliminary representation that these documents were irrelevant to Mr. Loeffler's claims.

34. The requested extension will not require changes to any other deadlines. Dispositive motions can still be filed in early 2027, expert discovery can proceed in the spring, and trial can remain set for May 2027. Alternatively, we would not oppose a short extension of those deadlines. I see no reason this case cannot be completed by the end of 2027.

35. Finally, to offset any potential prejudice to IBM, Mr. Loeffler has agreed to dismiss his retaliation claims, as his decision to opt out of a class action settlement does not appear to have played a role in his termination.

36. Pursuant to this Court's Local Rules, I certify that my colleagues and I met and conferred with IBM's counsel about this request before filing the instant motion.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

The conference occurred via Zoom on September 23, 2026. IBM's counsel did not agree to the request.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct. Executed this 8th day of October 2026 at Pasadena, California.

Scott J. Street

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

# EXHIBIT A

# REDACTED BECAUSE OF “CONFIDENTIAL” DESIGNATION ON EXHIBIT

# EXHIBIT B

**jloeffler@cox.net**

| | |
|---|---|
| **From:** | JOHN LOEFFLER |
| **Sent:** | Saturday, October 7, 2023 10:52 AM |
| **To:** | Michael Ryan |
| **Subject:** | Following Up (with some information) |
| **Attachments:** | Loeffler.docx |

Mike,

I've attached a document with some bulletized facts and information which I think will help flesh out my particular circumstances for you. I'd be happy to discuss or provide additional color as you see fit. I did not write this for you, most of it I copied from remarks I put into the system... some of my comments might be pointed – they are not pointed at you 😊.

In closing, I am humbled and sincerely grateful for your assistance.

Regards,

John

EXHIBIT
12
7/30/26 my

John Loeffler
Principal Cloud Platform Technical Specialist
IBM Technology, US Public and Federal Market
| 714-651-7874 | 600 Anton Blvd. Costa Mesa, CA |

Test Drive Our Digital Offerings!
https://www.ibm.com/demos
https://www.ibm.com/cloud/free

Of course, I am committed to maximizing results in my territory and helping my teammates do the same and I will continue to do so.

As I've written in some more detail elsewhere in this system, I do not agree with the characterizations herein as the metrics they are based on do not align with the work I've done and the work I've been asked to do. Nor are significant structural elements taken into account. I'm not pointing fingers, simply attempting to illustrate that applying a broad brush to what I feel have been my unique circumstances yields a result which is not only inaccurate, but likely detrimental to the organization.

My contention is that based on the circumstances, the PIP is invalid and should be rescinded.

Some important, but by no means a complete list of considerations in support of my contention:

- At the end of March, 2023, I was given a new assignment/territory and a new IPL, retroactive to January 1; I understand *why* this was done. However, it does not seem fair or a best practice to later rate/PIP someone against something they were not involved in and had no responsibility for at the time.

- My new manager seemed unaware of my retroactive IPL being issued late in Q1, indicating he thought it was much earlier in the quarter. This was during the PIP conversation, making it clear that this fact was not taken into account.

- NC, GA, FL, NY are whitespace for IBM Cloud; these are the only accounts in my IPL

- There is no IBM Cloud contracting vehicle for FL or SC; We are working to get IBM Cloud part numbers on NASPO for FL. In GA we must work through Partners.

- It is unreasonable to expect material results under these circumstances in a quarter or two, especially for a SLED only territory.

- It is unreasonable to expect a material trajectory change under these circumstances during the course of a five or six week "PIP"; especially in SLED

- Again, I was only really in the territory beginning in 2Q

- My Seller was consumed with and was directed to focus on Project Comet and did little else until August – this was the right thing to do but was to my detriment. In fact, my kindhearted Seller often apologized for this circumstance.

- I made a significant contribution to Project Comet, worth tens of millions to IBM, for which I'm (presently) receiving neither revenue or signings credit. I worked Project Comet for about nineteen months at this point and continue to do so.

- Other folks, who made little or no contribution to Comet are receiving revenue and signings credit; this hardly seems fair.

- In fact, it seems to me that *most* of the folks receiving TI credit for Comet did no work on the project, many of them not even being aware of the project.

- Irrespective of compensation, it hardly seems equitable that I should receive negative consequences while others avoid them based upon work I performed on Comet.

- The past several years, I have experienced significant periods of time with no Seller in the territory. As an example, in 2022, I went most of the year without a Seller; when a Seller was assigned, they were consumed with what I'll call "distractions", performing little "farming" and no prospecting. One of the Sellers was in a pitched battle with Arvind over the vaccine mandates, also bringing a lawsuit against IBM. Selling was demonstrably not a focus for this person in those circumstances.

- For 2H 2022, I was asked to promulgate ZaaS with Payers and within the team and "hold down the fort" until a Seller returned from leave (the date for which was indeterminate and fluid). I even trained Z HW & SW folks on the offerings. I engaged my ZaaS responsibilities with zeal and without complaint, being complimented often on my efforts by Eric, Tom and others.

- It was intimated that I would not suffer relative to the 2H 2022 situation and that I would be "taken care of".

- Most of what I covered in 2022 and 2021 was also white space for IBM Cloud. In fact, my manager created a new role for me for 2023 in part, because of the white space issue, indicating in a moment of sincerity and comradery, that this is something that should have been done long ago. (This new role went poof with the retroactive IPL)

- When presented with my retroactive 2023 IPL in late March 2023, it was understood and expected by all that I would realize at least $900K for Comet in NYS shortly. To be clear, at the time of my retroactive IPL I was told directly that I would realize between $900K and $1.2M for NYS within a month or less. Within a couple of weeks, finance determined that the $900K for NYS was going to be $0, or close to $0.

- There was significant discussion about the Comet figure for NYS and how we'd get credit towards my IPL there, or elsewhere.

- Crediting me for my work on Comet is still an open item

- If I was given proper credit for my Comet contribution, I would be over 100%. and that's just one of the other deals I worked.

- My significant contribution to Project Comet and the expectation that I would realize at least $900K for NYS is undisputed.

- My IPL covers NY, GA, SC, FL; my Seller covers several other states in addition; My Seller was consumed with Comet in 1H+/doing little in the other states we share. This remark is not a negative against Seller, simply a statement of circumstances in the territory.

- "Negative entry events" are a serious concern for me; I was impacted by this in 1H and while we caught and fixed some, the issue remains; I have low confidence that we have visibility to everything... from meetings with folks in finance and compensation it's clear that even they don't understand what's happening or the root cause; I should also mention that the negative entry events impacting me are reversals for transactions for accounts and periods I bore no responsibility for at the time.

In conclusion, it remains my contention that based on the foregoing, the PIP is invalid and should be rescinded.

# EXHIBIT C

**jloeffler@cox.net**

| | |
|---|---|
| **From:** | John Loeffler <jloeffler@cox.net> |
| **Sent:** | Friday, November 3, 2023 12:51 PM |
| **To:** | John Loeffler |
| **Subject:** | Fwd: 10/20 with Mike Ryan at 11:00 AM PDT |

Sent from my iPhone

Begin forwarded message:

> **From:** John Loeffler <jloeffler@cox.net>
> **Date:** October 26, 2023 at 1:57:44 PM PDT
> **To:** John Loeffler <jloeffler@cox.net>
> **Subject: 10/20 with Mike Ryan at 11:00 AM PDT**
>
> Was asking about exceptions… his conversations with legal & HR … "how would it look… SPM… making an exception for a white male…" ; I made a joke that I could self identify as a trans woman of color and we continued our conversation.
>
> It just now hit me what was said … my situation would not be considered because I'm a white male.

**jloeffler@cox.net**

| | |
|---|---|
| **From:** | jloeffler@cox.net |
| **Sent:** | Thursday, October 31, 2024 4:37 PM |
| **To:** | 'jloeffler@cox.net' |
| **Cc:** | 'jloeffler@cox.net' |
| **Subject:** | Recollections re Conversations with Mike Ryan |
| **Attachments:** | Info provided to Michael Ryan Legal + HR.pdf |

- Conversations were friendly, purposeful and seemed worthwhile. I was courteous and grateful for his help.

- Mike mentioned that all of the feedback he has gotten about me from Tom Scott, Rob McClean and others was stellar and that I should be proud of the reputation I had built

- Mike indicated his profound disappointment in what IBM/Eric was doing to me

- During our initial conversation, Mike was aghast about my situation, indicating he'd "never seen a 6 week PIP before". He indicated that a six week PIP was "ridiculous" and that one avenue he would pursue was talking to Eric about extending the PIP to be more reasonable, maybe year end or better yet, end of Q1 2024.

- Mike indicated that a 6 week PIP in Public Market was especially "ridiculous"

- Mike intimated that he might have responsibility for Cloud Platform Tech Sellers in 2024, exclaiming "what the hell… I need you on my team to be successful in 2024… this is crazy"

- Mike indicated that once on a PIP, you either exit the plan successfully or leave the company, no exceptions and no internal transfers allowed while on PIP.

- Mike said he would talk to HR and Legal about a review or exception for me, as my circumstances were unique in the extreme.

- Mike indicated that he thought technical people reporting to sales managers (Eric) was a poor circumstance as they "don't understand the value of technical people". Rob McClean said the same thing, adding that sales managers are "coin operated" and should not be managing technical folks.

- Mike indicated that another path he would pursue was meeting with legal and HR to see about a review or an exception based on the clear merits of the situation, suggesting I set up a weekly touchpoint for us to review progress, which I did for Fridays. As I recall, we kept each meeting except for one, when Mike indicated he had a conflict and no news to report.

- During our October 20, 2023 touchpoint meeting, Mike relayed that he was not making progress with HR or legal, indicating that he was told by both that "IBM would not review or grant an exception for a white male". I was crushed, but it did not immediately sink in what was really happening. I made a joke saying "I've got it.. I can fix this… I'll just self-identify as a trans woman of color". We laughed. During this conversation Mike also

mentioned that the fact I was "senior" didn't help things with legal and HR and that there might be more flexibility if I was an "early professional hire" (IBM speak for "young"). He said HR told him "how would it look if we made an exception for a white man". At this juncture, believing Mike had done all he could do, we discontinued our touchpoint meetings.

- Mike indicated during our conversations that "other Tech Sellers were getting similar treatment" as me and that "maybe similar demographics" were involved "if you know what I mean". Mike indicated that he did not agree with what was happening to me and other Tech Sellers.

- The attachment is info I presented to Mike Ryan to inform his conversations with legal & HR; he in turn provided the document to both legal and HR. Seeing what was happening to others around me and smelling a skunk, I had previously entered this same information into the IBM HR "Checkpoint" system sometime in June, so IBM and Eric Castillo were well aware of my circumstances and their inequity.

- As I recall, Michael had at least 3 or 4 conversations with both legal and HR.

- Mike indicated that his conversation with Eric about extending my PIP was like "talking to the wall" and that he thought Eric was "dead set" on firing me.

- Below are some Slack exchanges with Mike (also in Dropbox)




Search IBM
IBM Cloud Platfo...
Unread mentions
Brad Bentley, Pharist O'Ne...
Brian Pearson, Donna J...
Cesar Larrea, David Mi...
Cesar Larrea, Eric Casti...
Chris Starnes, Debbie Lang...
Donna Johnson
Donna Johnson, Michele K...
Donna Johnson, Michele K...
Michael Ryan
Pharist O'Neal
Pharist O'Neal, Rick Picozzi
Rick Picozzi
Tom Niedzwiecki
Add coworkers
Apps
AskHR chatbot
GameOn Bot
lighthousebot
Seismic Core
Your Learning at IBM
Add apps
Michael Ryan
Michael Ryan
Hi Mike, happy Wednesday . Thought I'd check in to see we've made f
Wednesday, October 11th
Thursday, October 12th
Michael Ryan
Hey John - I checked my calendar, you can get time next Friday on my calendar, as I will know more then. I'm still working things - had 3 calls so far - The rules are fairly clear, stated, and consistent around the SPM program and PIP's, so I am trying to work possible exceptions with legal and HR, but the tough part is once the PIP is started, the only way out is to clear the PIP.
John Loeffler 6:44 AM
Thank you Mike . I will put something on the calendar for 10/20. In case you did not see it, I sent you a document via email on Saturday, which may provide information helpful towards our goal.
John Loeffler 6:53 AM
(Rob mentioned that white space territory is a no-no for PIP's... my patch is virtually 100% white space for IBM Cloud)
Michael Ryan 6:57 AM
So there is no "WhiteSpace" in PubFed, every Client spends more than $20M a year with IBM. IBM does a large number of PIP's for reps in WhiteSpace, and they are held to the same performance requirements. However, we have granted exceptions/extensions to Delay PIP's for Whitespace territories to give reps a longer time to build pipeline where a rep has a solid performance history otherwise. This has to be done Before a PIP is created and not 2 weeks before a rep fails their PIP.
The Whitepsace exception/extension is more common in National or Digital where we don't have existing business with clients.
Friday, October 20th
Michael Ryan 11:01 AM
Meeting running late
Message Michael Ryan Busy


Search IBM
IBM Cloud Platfo...
Unread mentions
Brad Bentley, Pharist O'Ne...
Brian Pearson, Donna J...
Cesar Larrea, David Mi...
Cesar Larrea, Eric Casti...
Chris Starnes, Debbie Lang...
Donna Johnson
Donna Johnson, Michele K...
Donna Johnson, Michele K...
Michael Ryan
Pharist O'Neal
Pharist O'Neal, Rick Picozzi
Rick Picozzi
Tom Niedzwiecki
Add coworkers
Apps
AskHR chatbot
GameOn Bot
lighthousebot
Seismic Core
Your Learning at IBM
Add apps
Michael Ryan
Michael Ryan
Add a bookmark
The Whitepsace exception/extension is more common in National or Digit
Thursday, October 12th
sting business with clients.
Friday, October 20th
Michael Ryan 11:01 AM
Meeting running late
need a minute
John Loeffler 11:01 AM
NP
John Loeffler 11:55 AM
Thank you for your time today, Michael, I sincerely appreciate your involvement. Reflecting on your remarks re the broader landscape and implications for 2024, I'm wondering if what I'll term a "business case" could be laid as a foundation for exceptions or adjustments? I'm sure you're pondering that/no need to reply.
Friday, October 27th
Michael Ryan 6:01 AM
Hey John - I'm super booked up all morning and I don't have any updates
I need to cancel today
John Loeffler 6:01 AM
okay; I'll look for something next week.
Message Michael Ryan Busy

-

**jloeffler@cox.net**

**From:** JOHN LOEFFLER
**Sent:** Saturday, October 7, 2023 10:52 AM
**To:** Michael Ryan
**Subject:** Following Up (with some information)
**Attachments:** Loeffler.docx

Mike,

I've attached a document with some bulletized facts and information which I think will help flesh out my particular circumstances for you. I'd be happy to discuss or provide additional color as you see fit. I did not write this for you, most of it I copied from remarks I put into the system… some of my comments might be pointed – they are not pointed at you 😊.

In closing, I am humbled and sincerely grateful for your assistance.

Regards,

John

**John Loeffler**
Principal Cloud Platform Technical Specialist
IBM Technology, US Public and Federal Market
| 714-651-7874 | 600 Anton Blvd. Costa Mesa, CA |

Test Drive Our Digital Offerings!
https://www.ibm.com/demos
https://www.ibm.com/cloud/free

Of course, I am committed to maximizing results in my territory and helping my teammates do the same and I will continue to do so.

As I've written in some more detail elsewhere in this system, I do not agree with the characterizations herein as the metrics they are based on do not align with the work I've done and the work I've been asked to do. Nor are significant structural elements taken into account. I'm not pointing fingers, simply attempting to illustrate that applying a broad brush to what I feel have been my unique circumstances yields a result which is not only inaccurate, but likely detrimental to the organization.

My contention is that based on the circumstances, the PIP is invalid and should be rescinded.

Some important, but by no means a complete list of considerations in support of my contention:

- At the end of March, 2023, I was given a new assignment/territory and a new IPL, retroactive to January 1; I understand *why* this was done. However, it does not seem fair or a best practice to later rate/PIP someone against something they were not involved in and had no responsibility for at the time.

- My new manager seemed unaware of my retroactive IPL being issued late in Q1, indicating he thought it was much earlier in the quarter. This was during the PIP conversation, making it clear that this fact was not taken into account.

- NC, GA, FL, NY are whitespace for IBM Cloud; these are the only accounts in my IPL

- There is no IBM Cloud contracting vehicle for FL or SC; We are working to get IBM Cloud part numbers on NASPO for FL. In GA we must work through Partners.

- It is unreasonable to expect material results under these circumstances in a quarter or two, especially for a SLED only territory.

- It is unreasonable to expect a material trajectory change under these circumstances during the course of a five or six week "PIP"; especially in SLED

- Again, I was only really in the territory beginning in 2Q

- My Seller was consumed with and was directed to focus on Project Comet and did little else until August – this was the right thing to do but was to my detriment. In fact, my kindhearted Seller often apologized for this circumstance.

- I made a significant contribution to Project Comet, worth tens of millions to IBM, for which I'm (presently) receiving neither revenue or signings credit. I worked Project Comet for about nineteen months at this point and continue to do so.

- Other folks, who made little or no contribution to Comet are receiving revenue and signings credit; this hardly seems fair.

- In fact, it seems to me that *most* of the folks receiving TI credit for Comet did no work on the project, many of them not even being aware of the project.

- Irrespective of compensation, it hardly seems equitable that I should receive negative consequences while others avoid them based upon work I performed on Comet.

- The past several years, I have experienced significant periods of time with no Seller in the territory. As an example, in 2022, I went most of the year without a Seller; when a Seller was assigned, they were consumed with what I'll call "distractions", performing little "farming" and no prospecting. One of the Sellers was in a pitched battle with Arvind over the vaccine mandates, also bringing a lawsuit against IBM. Selling was demonstrably not a focus for this person in those circumstances.

- For 2H 2022, I was asked to promulgate ZaaS with Payers and within the team and "hold down the fort" until a Seller returned from leave (the date for which was indeterminate and fluid). I even trained Z HW & SW folks on the offerings. I engaged my ZaaS responsibilities with zeal and without complaint, being complimented often on my efforts by Eric, Tom and others.

- It was intimated that I would not suffer relative to the 2H 2022 situation and that I would be "taken care of".

- Most of what I covered in 2022 and 2021 was also white space for IBM Cloud. In fact, my manager created a new role for me for 2023 in part, because of the white space issue, indicating in a moment of sincerity and comradery, that this is something that should have been done long ago. (This new role went poof with the retroactive IPL)

- When presented with my retroactive 2023 IPL in late March 2023, it was understood and expected by all that I would realize at least $900K for Comet in NYS shortly. To be clear, at the time of my retroactive IPL I was told directly that I would realize between $900K and $1.2M for NYS within a month or less. Within a couple of weeks, finance determined that the $900K for NYS was going to be $0, or close to $0.

- There was significant discussion about the Comet figure for NYS and how we'd get credit towards my IPL there, or elsewhere.

- Crediting me for my work on Comet is still an open item

- If I was given proper credit for my Comet contribution, I would be over 100%. and that's just one of the other deals I worked.

- My significant contribution to Project Comet and the expectation that I would realize at least $900K for NYS is undisputed.

- My IPL covers NY, GA, SC, FL; my Seller covers several other states in addition; My Seller was consumed with Comet in 1H+/doing little in the other states we share. This remark is not a negative against Seller, simply a statement of circumstances in the territory.

- "Negative entry events" are a serious concern for me; I was impacted by this in 1H and while we caught and fixed some, the issue remains; I have low confidence that we have visibility to everything… from meetings with folks in finance and compensation it's clear that even they don't understand what's happening or the root cause; I should also mention that the negative entry events impacting me are reversals for transactions for accounts and periods I bore no responsibility for at the time.

In conclusion, it remains my contention that based on the foregoing, the PIP is invalid and should be rescinded.

# EXHIBIT D

# SETTLEMENT AGREEMENT

This Settlement Agreement (Agreement) is entered into among the United States of America, acting through the United States Department of Justice (the United States), and International Business Machines Corporation (IBM) (hereafter collectively referred to as "the Parties"), through their authorized representatives.

## RECITALS

A. IBM is a New York corporation and has its principal place of business in Armonk, New York. IBM provides products and services to the United States through contracts with the federal government.

B. The United States contends that it has certain civil claims against IBM arising from what the United States contends was IBM's knowing submission of false claims and knowingly making false statements to the United States as follows: as a federal contractor, IBM was required to comply with anti-discrimination requirements as set forth in Title VII of the Civil Rights Act of 1964, as incorporated into its federal contracts, and the Federal Acquisition Regulation, including at FAR clause 52.222-26. The United States contends IBM certified compliance in its federal contracts with these requirements while knowingly maintaining practices described below that the United States contends discriminated against employees during employment and applicants for employment because of race, color, national origin, or sex, and failed to treat employees during employment without regard to race, color, national origin, or sex. In addition, the United States contends IBM allocated costs to its federal government contracts relating to these practices and sought payment and reimbursement under its federal government contracts for such costs. The United States contends the practices included:

1. Modifications or adjustments to pay, bonus, or other compensation that caused employees to take race, color, national origin, or sex into account when making employment decisions, including a diversity modifier that tied bonus compensation to achieving demographic targets;

2. Taking race, color, national origin, or sex into account as part of decisions to hire, transfer, or promote through the use of "diverse interview slates," "diverse sourcing," and other related employment practices, including by altering interview eligibility criteria based on race, color, national origin, or sex;

3. Developing race and sex demographic goals for business units and taking race, color, national origin, or sex into account when making employment decisions to achieve progress towards those demographic goals;

4. Offering certain training, partnerships, mentoring, leadership development programs, educational opportunities or resources, and/or similar opportunities only to certain employees, with eligibility, participation, access or admission limited on the basis of race, color, national origin, or sex

during the period from January 1, 2019 through the Effective Date of this Agreement. The conduct described in this Paragraph B is referred to below as the Covered Conduct.

C. IBM has been credited in this settlement under the Department of Justice's Guidelines for Taking Disclosure, Cooperation and Remediation into Account in False

Claims Act Matters, Justice Manual § 4-4.112 for cooperation provided by IBM. The cooperation IBM provided included disclosing facts early that were relevant to the government's investigation and gathered during its independent investigation; providing information to assist in the determination of damages and penalties arising from the alleged conduct; and taking voluntary remedial measures, including the termination and/or modification of various programs, policies, or other activities described in the Covered Conduct.

D. This Agreement is neither an admission of liability by IBM nor a concession by the United States that its claims are not well founded.

E. IBM denies that it engaged in the Covered Conduct.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Agreement, the Parties agree and covenant as follows:

TERMS AND CONDITIONS

1. IBM shall pay to the United States $17,077,043, inclusive of civil penalties (Settlement Amount). Of that amount, $8,204,348 is restitution. The Settlement Amount shall be paid by electronic funds transfer pursuant to written instructions to be provided by the Civil Division of the United States Department of Justice. Payment shall be made no later than 14 days after the Effective Date of this Agreement.

2. Subject to the exceptions in Paragraph 3 (concerning reserved claims) below, and conditioned upon the United States' receipt of the Settlement Amount, the United States releases IBM, together with its current and former parent corporations;

direct and indirect subsidiaries; brother or sister corporations; divisions; current or former corporate owners; and the corporate successors and assigns of any of them, from any civil claim or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; or the common law theories of breach of contract, payment by mistake, unjust enrichment, and fraud.

3. Notwithstanding the release given in Paragraph 2 of this Agreement, or any other term of this Agreement, the following claims and rights of the United States are specifically reserved and are not released:

a. Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

b. Any criminal liability;

c. Except as explicitly stated in this Agreement, any administrative liability or enforcement right, or any administrative remedy, including the suspension and debarment rights of any federal agency;

d. Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

e. Any liability based upon obligations created by this Agreement;

f. Any liability of individuals.

4. IBM waives and shall not assert any defenses IBM may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the

Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

5. IBM fully and finally releases the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that IBM has asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, agents, employees, and servants, related to the Covered Conduct and the United States' investigation and prosecution thereof.

6. a. Unallowable Costs Defined: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47) incurred by or on behalf of IBM, and its present or former officers, directors, employees, shareholders, and agents in connection with:

(1) the matters covered by this Agreement;

(2) the United States' audit(s) and civil investigation(s) of the matters covered by this Agreement;

(3) IBM's investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil investigation(s) in connection with the matters covered by this Agreement (including attorneys' fees);

(4) the negotiation and performance of this Agreement;

(5) the payment IBM makes to the United States pursuant to this Agreement,

are unallowable costs for government contracting purposes (hereinafter referred to as Unallowable Costs).

b. Future Treatment of Unallowable Costs: Unallowable Costs will be separately determined and accounted for by IBM, and IBM shall not charge such Unallowable Costs directly or indirectly to any contract with the United States.

c. Treatment of Unallowable Costs Previously Submitted for Payment: Within 90 days of the Effective Date of this Agreement, IBM shall identify and repay by adjustment to future claims for payment or otherwise any Unallowable Costs included in payments previously sought by IBM or any of its subsidiaries or affiliates from the United States. IBM agrees that the United States, at a minimum, shall be entitled to recoup from IBM any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted requests for payment. The United States, including the Department of Justice and/or the affected agencies, reserves its rights to audit, examine, or re-examine IBM's books and records and to disagree with any calculations submitted by IBM or any of its subsidiaries or affiliates regarding any Unallowable Costs included in payments previously sought by IBM or the effect of any such Unallowable Costs on the amount of such payments.

7. This Agreement is intended to be for the benefit of the Parties only.

8. Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

9. Each Party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

10. This Agreement is governed by the laws of the United States. The exclusive venue for any dispute relating to this Agreement is the United States District Court for the Southern District of New York. For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

11. This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

12. The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

13. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

14. This Agreement is binding on IBM's successors, transferees, heirs, and assigns.

15. All Parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

16. This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement). Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

THE UNITED STATES OF AMERICA

DATED: 04.10.26 BY: ______________________

Stanley E. Woodward, Jr.
Associate Attorney General
United States Department of Justice

DATED: 4/10/2026 BY: ______________________

Brenna E. Jenny
Deputy Assistant Attorney General
Jamie Ann Yavelberg
Director
Commercial Litigation Branch
Civil Division
United States Department of Justice

INTERNATIONAL BUSINESS MACHINES CORPORATION

DATED: 4/10/26 BY: ______________________

Tonja De Sloover
Vice President and Global Corporate Counsel
IBM

# EXHIBIT E

REDACTED BECAUSE OF “CONFIDENTIAL” DESIGNATION ON EXHIBIT

# EXHIBIT F

REDACTED BECAUSE OF “CONFIDENTIAL” DESIGNATION ON EXHIBIT

# EXHIBIT G

REDACTED BECAUSE OF "CONFIDENTIAL" DESIGNATION ON EXHIBIT

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

## CERTIFICATE OF SERVICE

At the time of service, I was over 18 years of age and not a party to this action. I am employed by JW Howard/Attorneys, LTD. in the County of San Diego, State of California. My business address is 600 West Broadway, Suite 1400, San Diego, California 92101.

On October 8, 2026, I electronically filed the **AMENDED DECLARATION OF SCOTT J. STREET IN SUPPORT OF MOTION TO MODIFY SCHEDULING ORDER** and served the documents using the Court's Electronic CM/ECF Service, which will send electronic notification of such filing to all registered counsel.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 8, 2026, in San Diego, California.

*/s/ Dayna Dang*
Dayna Dang, Paralegal
dayna@jwhowardattorneys.com